UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Camelot LLC,<br><br>            Plaintiff,<br><br>vs.<br><br>AMC ShowPlace Theatres, Inc.,<br><br>            Defendant. | Civil File No. 0:10-cv-04255<br>(ADM/JJK)<br><br>**AMC SHOWPLACE THEATRES, INC.'S MEMORANDUM IN OPPOSITION TO CAMELOT LLC'S MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Downtown Minneapolis' Block E, infamous in its previous life as a refuge for the downtrodden, was restyled into an upscale entertainment center, owing to a Redevelopment Agreement in 2000 between Minneapolis Community Development Agency ("MCDA") and a developer, Block E Interests, LLC ("Developer"). (Affidavit of DeAnne Hilgers ("Hilgers Aff."), Exh. 1.) The Developer is a predecessor of Plaintiff Camelot, LLC ("Camelot"), which now owns the Block E complex. (Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Camelot Memo."), p. 2; Affidavit of Phillip M. Jaffe ("Jaffe Aff."), ¶2.)

The Redevelopment Agreement required Developer to construct a theatre and other improvements at Block E, and to enter into a lease with MCDA for the parcels that comprise Block E (the "Redevelopment Property"). (Hilgers Aff., Exh. 1, p. 12.) The lease between MCDA and Developer gives the Developer the right to purchase MCDA's interest in the property for the cost of one dollar when the Lease ends in 2028. (Hilgers Aff., Exh. 2, p. 4.)

The Block E redevelopment project was costly. MCDA, along with the City of Minneapolis, provided several million dollars in financial assistance for the project, for items including parking ramp construction, land acquisition, relocation of tenants, relocation of the Shubert Theater and certain environmental remediation costs. (Id., Exh. 1, pp. 19-21.) To fund the project, the Minneapolis City Council approved up to $30,000,000 in bonds, and MCDA committed to pay up to $22,750,000. (Hilgers Aff., Exh. 1, pp. 7, 19-20 (Maximum Agency Commitment); Exh. 6, p. 525.)

Originally, the theatre at Block E was operated by Crown Theaters ("Crown"). (Declaration of Robert Gallivan ("Gallivan Dec."), ¶1.) Crown experienced financial difficulties and discontinued its operations at Block E. In 2007, the Developer asked Kerasotes ShowPlace Theatres, LLC ("Kerasotes") to lease the theatre space. (Gallivan Dec., ¶2.) Aware of the difficulties faced by Crown, and recognizing the financial risks that would be encountered by a new lessee, Developer and Kerasotes negotiated a theatre lease, with rent based upon gross sales, for an initial period of five years and an Option to Extend for two successive periods of five years each. (Gallivan Dec., ¶¶5-6; Jaffe Aff., Exh. A, hereinafter, the "Lease.") Three years have lapsed under the initial period of the Lease. In May 2010, AMC ShowPlace Theatres, Inc. ("AMC") purchased Kerasotes, and is now the tenant under the Lease. (Gallivan Dec., ¶8, Jaffe Aff., ¶4.)

In July 2010, Camelot purchased the Block E project for a fire sale price of approximately $14 million. (Hilgers Aff., Exh. 7.) The $14 million figure may be extrapolated from the $46,200 which was paid as state deed tax for the project, multiplied by the applicable tax rate. (Id., see also Hilgers Aff., Exh. 4.)

2

As part of the July 2010 conveyance, Camelot has reaped the benefits of the Redevelopment Agreement. It also is responsible for complying with all of the terms of the Lease, as negotiated by Developer and Kerasotes, including AMC's right to exercise the Option to Extend the Lease for two, successive five-year periods.

It is in this context that Camelot's motion for summary judgment must be considered. As established below, the motion must fail, since the Option to Extend in Section 3.4 of the Lease is unambiguous, certain and enforceable, and Camelot cannot demonstrate a legal right to summary judgment. AMC is entitled to enforcement of the Option to Extend and, pursuant to Federal Rules of Civil Procedure 56(f), respectfully asks the Court to render summary judgment in its favor.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

AMC does not agree with the conclusory statements presented by Camelot as "undisputed facts." For example, AMC objects to Camelot's repeated - and false - characterizations of the Option to Extend, as defined in Section 3.4, as a "renewal." (Camelot Memo., pp. 2-5.) AMC also disputes that the Lease will terminate on September 12, 2012. (Id., p. 2.) AMC disagrees with Camelot's assertion that the Lease leaves open rent terms for the Option Periods. (Id., pp. 3-4.) And Camelot is just plain wrong when it argues that the Option to Extend in Section 3.4 of the Lease is somehow an "unenforceable agreement to agree." (Camelot Memo., p 5.)

It is undisputed that Camelot is the landlord and AMC is the tenant of an 84,000 square foot movie theatre in Block E of downtown Minneapolis, Minnesota. (Gallivan

3

Dec., ¶8; Jaffe Aff., ¶5.) The remaining undisputed facts, for purposes of this motion, are found within the four corners of the Lease, including the following:

1. The initial term of the Lease between Camelot and AMC runs through September 30, 2012. (Lease, Section 1.1(B).)

2. The Lease provides AMC with two, successive Options to Extend for an additional period of five Lease Years, as clearly set forth in Section 3.4:

> **SECTION 3.4 OPTION TO EXTEND.**
>
> Subject to the terms of this Section 3.4, Tenant (AMC) shall have two (2) successive *options to extend* the term of this Lease for an additional period of five (5) Lease Years (each such period called, as appropriate, the "First Option Period" and the "Second Option Period", generally an "Option Period" and collectively, the "Option Periods"), each such Option Period to begin upon the expiration of the Lease Term or of this Lease as extended on the same terms and conditions set forth herein, except that (i) Option Periods, once exercised cannot be exercised again, (ii) no Rent concessions, abatements, lease buyouts, tenant allowances or limitations on tax or expense pass-throughs granted with respect to the Lease Term hereof shall be applicable to any Option Period, (iii) Minimum Rent for each Option Period shall be as shown above.
>
> *In order to exercise its option to extend*, the following conditions must be satisfied: (i) Tenant shall provide Landlord with written notice of its irrevocable election to extend not less than nine (9) months, nor more than twelve (12) months, prior to the expiration of the Lease Term (as the same may have been previously extended), time being of the essence; (ii) on the date that Tenant exercises its option as well as on the date that the Option Period is to commence, no default shall exist and no event shall exist which, by the giving of notice or the passage of time, or both, would mature into a default; (iii) Tenant shall have exercised all previous options that were capable of being exercised; and (iv) the originally named Tenant has not assigned this Lease or sublet

all or any portion of the Leased Premises, except in either case to Permitted transferees (as hereinafter defined); and (v) Tenant has and continues to fully operate and occupy the Leased Premises for the uses permitted hereunder.

(Emphasis added.)

3. "Minimum Rent" is defined in Section 1.1(E) of the Lease as follows:

Minimum Rent: Commencing on the Commencement Date and continuing through the Term as shown below:

Commencement Date through the last day of the fifth (5th) Lease Year:

i. fifteen percent (15%) of Gross Sales (as hereinafter defined) in excess of $3,000,000.00 per full Lease Year through $5,000,000.00;

ii. twenty percent (20%) of Gross Sales in excess of $5,000,000.00 per full Lease Year through $7,000,000.00; and

iii. twenty five percent (25%) of Gross Sales in excess of $7,000,000.00.

4. The Lease specifically omits, and does not address, percentage rent, security deposit, relocation, tax rent, landlord's operating costs, security for tenant's work, marketing fund, grand opening fee and approval of lender. (Lease, Sections 1.1(F), 1.1(H), 2.3, 5.3, 5.8, 6.3, 6.4, 9.4, 13.1, 13.3, 13.4, 17.24.)

5. Minnesota law governs interpretation of the Lease. (Lease, Section 17.8.)

5

## ANALYSIS

**I.    Standard of Review.**

A.    <u>Summary Judgment Standard</u>.

In analyzing a motion for summary judgment, the court must view "all evidence and reasonable inferences in the light most favorable to the nonmoving party." <u>Barstad v. Murray County</u>, 420 F.3d 880, 883 (8th Cir. 2005). "Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." <u>Id</u>. (citations omitted). All doubts and factual inferences must be resolved against the moving party. <u>Northwestern Auto Parts Co. v. Chicago, B & Q R. Co.</u>, 240 F.2d 743, 746 (8th Cir. 1957); <u>Nord v. Herreid</u>, 305 N.W.2d 337, 339 (Minn. 1981). If the Court determines that the nonmoving party is entitled to summary judgment, the Court may grant summary judgment for the nonmoving party, in this case, AMC. Fed. R. Civ. P. 56(f) (effective December 1, 2010).

B.    <u>Construction of the Lease Is a Question of Law</u>.

The construction and effect of a contract is a question of law, absent an ambiguity. <u>Brookfield Trade Ctr., Inc. v. County of Ramsey</u>, 584 N.W.2d 390, 394 (Minn. 1998). The purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the entire contract. <u>Art Goebel, Inc., v. North Suburban Agencies</u>, 567 N.W.2d 511, 515 (Minn 1997). AMC and Camelot agree that the terms of the Lease are unambiguous. (<u>See</u> Camelot Memo., pp. 10.)

A lease is a form of contract. <u>Minneapolis Public Housing Authority v. Lor</u>, 591 N.W.2d 700, 704 (Minn. 1999). Like other contracts, unambiguous lease language "must

be given its plain and ordinary meaning, and shall be enforced by the courts even if the result is harsh." Id.

## II.  Section 3.4 of the Lease is an Enforceable Option to Extend.

A.  The Option in the Lease Is An Option to Extend, Exercisable On Timely Notice.

The legal distinction between an option to extend and an option to renew is well-established: an option to extend continues the original lease, while an option to renew requires a new lease. Tilleny v. Knoblauch, 73 Minn. 108, 113, 75 N.W. 1039, 1041 (1898). In King v. Dalton Motors, Inc., 260 Minn. 124, 126, 109 N.W.2d 51, 52 (1961), the Minnesota Supreme Court held that, where a lease includes an option to extend, the option will be enforced unless the lease terms are "so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation." Under the particular facts in King, including a specific requirement that terms and conditions for the option period were "to be agreed upon at the time of the option renewal," the Court found that this stringent standard had been met. Id. at 125. According to the Court:

> It is a fundamental rule of law that an alleged contract which is so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable. Consequently, where substantial and necessary terms are specifically left open for future negotiation, the purported contract is fatally defective.

Id. at 126. Significantly, the Court continued with the following observation:

> On the other hand, the law does not favor the destruction of contracts for indefiniteness, and if the terms can be reasonably ascertained in a manner prescribed in the writing, the contract will be enforced.

Id. (emphasis added).

7

Here, in Section 3.4 (which by its terms defines the nature of the option as negotiated by the parties), the option is plainly and consistently defined as an "Option to Extend." (Lease, Section 3.4.)  First, Section 3.4 is titled "Option to Extend." Second, Section 3.4 specifically states that "[t]enant shall have two (2) successive <u>options to extend</u> the term of this Lease for an additional period of five (5) Lease Years …." Third, Section 3.4 lists five conditions that must be met by the lessee "<u>in order to exercise its option to extend</u>," including (1) provision of timely notice; (2) existence of no default; (3) exercise of all previous options capable of being exercised; (4) assignment as permitted under the Lease; and (5) continuous operation and occupation of the leased premises. Notably, the conditions expressly articulated in Section 3.4 of the Lease do not include any requirement for negotiation or renegotiation of terms.

Despite the plain language in Section 3.4, designating the option to continue the Lease as an Option to Extend, Camelot argues that the stringent standard articulated in <u>King</u> has been met here, based on the meritless assertion that "[t]here is no rent provision for the Option Periods." (Camelot Memo., p. 8.)  As demonstrated below, however, rent applicable to the Option Periods is established by the clear language of the Lease.

B.      <u>"Minimum Rent," as Defined in Section 1.1(E), Applies to the Option Periods.</u>

The rent provision in the Option to Extend set forth in Section 3.4 of the Lease is crystal clear: "Minimum Rent for each Option Period shall be as shown above." (Lease, Section 3.4.)  In Section 1.1(E), which is located above Section 3.4, "Minimum Rent" is precisely defined through a percentage formula based on gross sales.  Thus, rent for the Option Periods is clear in Section 3.4, which expressly adopts and incorporates the plain

8

language from Section 1.1(E).  <u>Minneapolis Public Housing Authority v. Lor</u>, 591 Nw.2d 700, 704 (Minn. 1999) (unambiguous lease language must be given its plain and ordinary meaning).

Instead of recognizing the plain language of Section 3.4, Camelot tries to claim that the Minimum Rent formula applies only to the initial term, and that no other provision of the Lease "provides a rental calculation that applies after the Lease's initial term." (Camelot Memo. pp. 3, 8.)  In fact, the Minimum Rent formula established in Section 1.1(E) provides a precise, measurable standard for calculating Minimum Rent, a standard expressly incorporated in the Option to Extend in Section 3.4.  A formula or measurable standard for establishing rent in an option period provides a basis for creating an enforceable option to extend.  <u>See</u> <u>Unity Investors Ltd. Partnership v. Lindberg</u>, 421 N.W.2d 751, 754 (Minn. Ct. App. 1988) (holding that a renewal option in a lease was an option to extend where rent for the renewal period was calculated at 125 percent of square footage rental price of the initial term); <u>see also</u> <u>Anderson v. U.S.</u>, 468 F.Supp. 1085, 1092 (D. Minn. 1979) (contract provision that established a measurable standard for the price to purchase a franchise, even where contract failed to identify specific price, was an enforceable contract provision).

Thus, contrary to Camelot's assertion, rent applicable to the Option Periods is clearly set forth in Section 3.4, which adopts and incorporates the Minimum Rent formula in Section 1.1(E).  This logical conclusion is consistent with the rule requiring contracts to be construed as a whole, with all provisions harmonized where possible, in order to avoid interpretation that would render one or more provisions meaningless.

9

Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 526 (Minn. 1990).  See also King, 260 Minn. at 126, 109 N.W.2d at 53 (lease terms that can be reasonably ascertained will be enforced).

C.     The Lease Does Not Contain Allowances or Limitations For Tax, Operating or Marketing Costs; Terms Related to these Costs were "Intentionally Omitted."

The Lease specifically assigns responsibility for payment of real estates taxes and operating costs to the landlord.  (Lease, Section 5.7) ("Landlord acknowledges and agrees that Landlord shall pay all taxes promptly."); (Lease, Section 6.2) ("Landlord shall (or shall cause the same to be done) operate, manage, equip, light, secure, repair, replace and maintain the Common Areas for their intended purposes in such a manner as consistent with the operation and maintenance of comparable mixed-use projects in the Minneapolis-St. Paul, Minnesota metropolitan area ….")  Any provisions that would make the tenant responsible for payment of these costs were "Intentionally Omitted" from the Lease.  (Lease, Sections 5.8, 6.3, 6.4, 13.1 and 13.2.)

Camelot tries to characterize these Lease provisions as creating "allowances" or "limitations" applicable only to the initial term.  From this faulty proposition, Camelot reasons that there are no terms related to taxes and operating costs, including marketing costs, applicable to the Option Periods, somehow rendering the Option to Extend "completely illusory," and an "unenforceable agreement to agree."  (Jaffe Aff., ¶7, Camelot Memo. pp. 3, 12).  Camelot is wrong.

First, the above-quoted Lease provisions define the parties' rights and responsibilities for the initial term, as well as the Option Periods.  The phrase

"Intentionally Omitted" means just what it says - that the Lease was specifically negotiated to <u>omit</u> any provisions assigning responsibility for taxes and operating costs, including marketing costs, to the tenant. Instead, those costs were allocated to landlord. <u>Minneapolis Public Housing Authority</u>, 591 N.W.2d at 704 (unambiguous contract language must be given its plain and ordinary meaning).

The lack of an existing clause in a lease allowing the landlord to pass through costs to the tenant is sufficient to demonstrate that the costs are to be excluded from the lease. <u>See</u> <u>Bureau of Collection Recovery, Inc. v. Eden West Partners L.L.C.</u>, 2001 WL 799871 at *2 (Minn. Ct. App. 2001). In <u>Bureau of Collection Recovery, Inc.</u>, the Minnesota Court of Appeals denied a landlord's claim that the tenant's rent, calculated from the landlord's operating costs, included the costs of real estate taxes because there was no provision in the lease for paying real estate taxes. <u>Id</u>. Thus, costs such as real estate taxes are excluded as a tenant obligation unless otherwise provided for in a lease.

Second, the Lease was negotiated by sophisticated parties, who would have clearly designated any tenant allowances or limitations that were intended. For example, Section 9.9 in the Lease is titled "Tenant Allowances," and describes certain landlord credits for point of sale and concession equipment, and for signage. Nothing in Section 9.9, however, places real estate taxes or operating/marketing costs in the category of "allowances."

Third, Section 3.4 in the lease provides, in part, that the Option to extend shall be on the "same terms and conditions set forth herein, except that … no Rent concessions, abatements, lease buy-outs, tenant allowances or limitations on tax or expense pass-

11

throughs granted with respect to the Lease Term hereof shall be applicable to any Option Period." Camelot contends that this language will be rendered meaningless unless "different" terms for real estate taxes and operating and marketing costs apply to the Option Periods. (Camelot Memo., p. 9.) Of course, since the Lease contains no such provisions, nothing exists from which a difference can be derived.

Also, as discussed above, Section 9.9 specifically defines Tenant Allowances, to which the Section 3.4 exception applies. (See Gallivan Dec., ¶7) ("With the exception of tenant allowances provided to Kerasotes to begin operations in Block E, the parties intended that the lease be extended on the same terms and conditions that were negotiated in the initial term of the lease.") Thus, Camelot cannot credibly assert that the exception language in Section 3.4 will be rendered meaningless if its interpretation is rejected.

Finally, as Camelot repeatedly points out, the Lease provides a mechanism for modifications. (Lease, Section 17.9.) The exception language in Section 3.4 would also be applicable to any concessions, buy-outs, allowances or limitations negotiated in connection with a lease modification. Indeed, the exceptions listed in Section 3.4 do not all relate to existing lease terms and therefore would apply only in the event of a Lease modification. For example, the existing Lease is completely silent as to a lease buyout, however, a lease buyout is listed as an exception in Section 3.4. As Camelot admits, it has carefully reviewed the files for Block E and has found no written modification of the material terms for the Option Periods. (Camelot Memo., p. 4.)

Quite clearly, the Lease contains an Option to Extend which requires no further negotiations, and for which the terms are clear. Under the standard articulated in King, the Option to Extend must be enforced.

D.   Cases Cited By Camelot are Uniformly Inapposite.

The cases to which Camelot cites all involve contract provisions deemed unenforceable because the parties reflected an express and deliberate intention to negotiate in the future. Lindgren v. Clearwater Nat'l Corp., 517 N.W.2d 574 (Minn. 1994) (contract to "enter into a definite purchase agreement which shall be drafted by the buyers within 30 days" was an agreement to negotiate and not a complete and final agreement); King, 260 Minn. 125, 109 N.W.2d at 52 (lease providing that option terms and conditions "are to be agreed upon at the time of the option renewal" was an unenforceable option); Sanford v. Tuchelt, 158 N.W. 245, 246 (Minn. 1916) (renewal provision in lease unenforceable where rent for the option period was "to be then and there decided" at the end of the initial term); Upper Swede Hollow Neighborhoods Ass'n v. Khatib, 2002 WL 31012235 (Minn. Ct. App. 2002) (lease provision for parties to agree to agree to new lease terms if profits increase substantially is not enforceable); Winger Assocs., Inc. v. Acky-Minnetonka Ltd. Partnership, 2001 WL 1607659 at *2 (Minn. Ct. App. 2001) (option to renew a lease that required landlord and tenant to "use their best efforts" to reach agreement for option period was not enforceable); Mohrenweiser v. Blomer, 573 N.W.2d 704, 707 (Minn. Ct. App. 1998) (letter of agreement to outline "terms of a future transaction" and "the parties agree to proceed forward with formal agreement" is an unenforceable agreement to agree); First Trust Co. v. Holt, 361 N.W.2d

13

476, (Minn. Ct. App. 1985) (agreement to enter into a lease at closing of sale of property was not enforceable); Ohio Calculating, Inc. v. CPT Corp., 846 F.2d 497, 501 (8th Cir. 1988) (agreement to "enter into negotiations" and use appraiser's estimated market value as the basis for "good faith negotiations" is not an enforceable provision); Walker v. Keith, 382 S.W.2d 198, 199 (Ky. 1964) (lease renewal provision unenforceable where parties where rent "shall actually be agreed upon" at the time of renewal).

Camelot's cited cases demonstrate that to establish an unenforceable "agreement to agree," the parties must specifically leave open substantial and necessary terms for future negotiation. See also Hyman Freightways v. Carolina Freight Carriers Corp., 942 F.2d 500, 503 (8th Cir. 1991) (agreement for lease assignment is unenforceable where date of assignment is "to be determined by mutual consent"); Perez v. Las Americas, Inc., 2002 WL 1163646 *1 (Minn. Ct. App. 2002) (option terms and conditions that "shall be determined at time of the exercise of the options" was not an enforceable option).

The Option to Extend in the Lease at hand is not an unenforceable "agreement to agree." To the contrary, the plain terms of the Lease provide for two successive Option Periods of five years for each, under the same terms and conditions as the initial term. The exceptions in Section 3.4 identified by Camelot simply do not apply here.

Because Camelot cannot point to any language in the Lease that specifically leaves substantial and necessary terms for future negotiation, it fails to demonstrate that the Option to Extend is "so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation" as an "agreement to agree." King, 260 Minn. at

126, 109 N.W.2d at 52. To the contrary, the Option to Extend clearly sets forth the option terms and must be enforced.

## CONCLUSION

Camelot is required to comply with the negotiated terms of the Lease. AMC respectfully requests the Court to deny summary judgment to Camelot and grant summary judgment to AMC, holding that the Option to Extend is an enforceable provision of the Lease.

DATED: January 4, 2011  **LINDQUIST & VENNUM P.L.L.P.**

By  /s/ Ann Kennedy
Ann Kennedy, # 021081x
akennedy@lindquist.com
DeAnne M. Hilgers, #0301784
dhilgers@lindquist.com
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**ATTORNEYS FOR DEFENDANT
AMC SHOWPLACE THEATRES, INC.**